## THE TRANSIT.

## THE MONTAUK.

### (District Court, E. D. New York. January 2, 1904.)

1. COLLISION—STEAM VESSELS CROSSING IN EAST RIVER—NEGLIGENT NAVIGATION IN NIGHT.

The tug Transit backed out of a slip in East river in the night as the tug Montauk was coming down with two car floats on her port side. The Transit gave her a signal of one whistle, which was assented to, and started to cross ahead, while the Montauk ported and slowed. When the Transit had partly crossed, she saw for the first time a ferryboat east and nearly abreast of the Montauk, and, being unable to cross ahead of such boat, attempted to pass between the two, coming into collision with the Montauk's tow. The tide was flood. The channel was about 1,500 feet wide, and the Montauk and her tows were in about the center of the west side. *Held*, that the Transit was in fault for attempting to cross the Montauk's bows, without knowing that there was no vessel on the other side, when she might have waited; that the Montauk, while properly handled, was chargeable with contributory fault for not being in the center of the channel, as required by the local statute, in which case the Transit, which was intending to go up the river, would have passed on the west side of her.

In Admiralty. Cross-libels for collision.

Wheeler, Cortis & Haight (Mr. Haight and Mr. Smith, of counsel), for McLaren and the Montauk.

James Armstrong (Mr. Brown and Mr. Gove, of counsel), for Philadelphia & Reading Ry. Co., and the Transit.

THOMAS, District Judge. In the early morning, just before the day was breaking, and when only lights could be seen at a distance, the tug Transit, having put her tow in the slip at Stanton street, backed out from the slip between Piers 61 and 62, so that her stern was carried by the strong flood tide up the river, and thereupon she went to port, with the intention of crossing the bow of the Montauk, and turning then upstream to Fourteenth street. She had already seen upriver the Montauk, coming down with two car floats on her port side, and as the Transit was turning, or as she started across stream, she gave the Montauk one whistle, which indicated her desire to cross the Montauk's bow. The Montauk answered with one whistle, port-

ed somewhat, and slowed. Before the Transit could effect her passage across the Montauk's course, she discovered a steamboat going down the river on a course about 25 feet to the port of the Montauk. The master of the Transit saw at once that he could not pass the ferryboat, so he exchanged two whistles with her, attempting to go between the Montauk and Transit, where there was about 25 feet of space, but his port side came in contact with the port corner of the port float of the Montauk, whereby both vessels were injured. Hence the above actions.

The Montauk was 300 or 350 feet in the river, and her own beam and that of her tows would make perhaps 100 feet more. The river at that point is about 1,900 feet wide, and the distance between the piers on each side of the river is about 1,500 feet. It was dark, and the vessels could judge of each other's position only by lights. The Transit was in a safe position to await the Montauk's passage. The pilot of the Transit alone was on actual duty, although two deck hands were about, but not relied upon to help for the purposes of lookout, nor did they. The evidence tends to show that the pilot of the Transit did not look diligently for any other vessel than the Montauk. It is inferable that, had he looked carefully, he would have seen at least the upper lights of the ferryboat, which he did not discover until she was about 200 feet upstream from him, and had nearly passed the Montauk's tow. The pilot of the Transit chose the perilous course of crossing on a strong flood tide ahead of a large and unwieldy tow, seen upstream at a distance of some 600 or 700 feet. Under such circumstances he should have used more than usual care to assure himself that the way was clear outside of the Montauk and her tow. He did not use such care, as is evidenced by his failure to make discovery of any part of the ferryboat until she was only 200 feet away from his projected course across the river. If he could not see over the float, he should not have attempted to cross her bows in ignorance of what might be beyond. He had no right to go forward trusting to the chance that there would be nothing in his way. Considering the conditions, the pilot of the Transit acted with too little circumspection, and his fault contributed to the accident.

The next question is whether the Transit's negligence was the sole cause of the collision. The Montauk is criticised for not stopping, or for not stopping earlier. This is an attempt to demand that the Montauk should, in the darkness, have grasped the result of the Transit's fault, and avoided the consequences, and by some action on her part not required by the Transit's signal. The Transit asked the right to cross the Montauk's bow, and it was accorded. The Hollins was behind the Montauk, and hence out of her view, while the Transit had both the duty and better opportunity of seeing her until she came alongside. It is considered that, when the danger was threatened, the Montauk did all that was demanded of her. She slowed, stopped, and backed, to help ward off the injury arising from the Transit's culpability. The Transit initiated the maneuver and acted. No harm would have arisen from the plan concerted by the two vessels. The cause of the collision was the introduction of a new element, to wit, the presence of the ferryboat. It disconcerted the plans that were

well enough conceived, as between the Transit and Montauk, but the presence or absence of this very element should have been discovered by the Transit before she initiated or attempted the maneuver. The Montauk acted in good faith, and her action is not impugned by the estimates of times and distances upon the trial, showing what it was possible to do.

But did the Montauk's proximity to the New York shore contribute to the accident? The navigable part of the channel is said to be 1,450 feet. The captain of the Montauk stated that he was 300 or 350 feet from the New York shore. Hence the Montauk had about 725 feet on the New York side of the center line of the river. If allowance be made for the beam of the Montauk herself and her floats, the port side of the float was about 270 or 300 feet from the center of the river; that is, the Montauk was navigating about in the center of the New York side of the river, rather than the center of the river, and the Hollins was some 25 feet outside of her. Of course, that was not a compliance with the statute. But it is urged that the position of the Montauk did not contribute to the accident. If the Montauk had been in the position demanded by the statute, the tug would have gone about on the inside of her, and passed under her stern. It is urged that there was room to do this at the time. But the Transit could not determine very accurately whether she had space enough to go about, swinging her whole length up the river. The tide was running strong, and under the circumstances it cannot be said that this was a better alternative than her attempt to cross the Montauk's bow. It would seem that her best choice would have been to remain where she was; but both she and the Montauk agreed otherwise. In the second place, the Montauk, from her position, blanketed the ferryboat, so as to diminish the opportunity of the pilot of the Transit to see her. While it is believed that he could have seen her by the use of much diligence, or, in case of his inability to see, should not have attempted to cross, yet he may have confused her upper lights with those of the Montauk; and in any case, had the Montauk been out of the way, the ferryboat would have been easily seen. In that case the Transit would not have been rash enough to attempt to pass in front of the rapidly moving ferryboat. The fact was that the Montauk's presence aided the necessity of the Transit trying to pass between two vessels within an unlawful distance from the shore. The congestion was such that it could not be done, and the accident happened. The statute was intended to prevent just such happenings.

The conclusion is that the Montauk, by her violation of the statute, contributed to the accident; hence the damages and costs will be divided.